# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALIGN TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 17-1646-LPS |
| | ) | |
| 3SHAPE A/S, 3SHAPE TRIOS A/S, and 3SHAPE, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ALIGN TECHNOLOGY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | Civil Action No. 17-1647-LPS |
| 3SHAPE A/S, 3SHAPE TRIOS A/S, and 3SHAPE, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM ORDER

Presently pending in these patent infringement actions is Defendants 3Shape A/S, 3Shape

Trios A/S ("3Shape Trios") and 3Shape, Inc.'s ("3Shape US," and collectively, "3Shape" or

"Defendants") Motion for Protective Order (the "Motion"). (D.I. 145)[1] The Motion is opposed

by Plaintiff Align Technology, Inc. ("Plaintiff"). For the reasons set forth below, the Court

orders that the Motion be DENIED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Parties and the Patents-in-Suit

---

[1]    Citations herein will be to the docket in Civil Action No. 17-1646-LPS, unless otherwise noted.

Plaintiff is a Delaware corporation with its principal place of business in San Jose, California. (D.I. 78 at ¶ 1)  Plaintiff is a global medical device company that develops products, such as iTero intraoral scanners and OrthoCAD software, which help dental and orthodontic professionals deliver options to their patients. (*Id.* at ¶ 24)

Defendants 3Shape A/S and 3Shape Trios are both Danish corporations with each of their principal places of business in Denmark. (*Id.* at ¶¶ 2, 3)  Defendant 3Shape US is a Delaware corporation with its principal place of business in Warren, New Jersey. (*Id.* at ¶ 5)  Defendants design, develop, manufacture and market the TRIOS and TRIOS 3 scanners, as well as related software products (the "accused products"), which are also sold and imported into the United States to assist dental and orthodontic professionals. (*Id.* at ¶ 29)

In these cases, Plaintiff is alleging that Defendants' accused products infringe the following patents relating to intraoral scanners:  United States Patent Nos. 9,510,757; 9,299,192; 7,112,065; 9,427,916; 8,454,364 and 8,845,330. (*Id.* at ¶¶ 18-23, 32-127)

**B.    Procedural History**

The parties' instant dispute relates to issues involving the patent-agent privilege, an issue that the parties have litigated in the United States International Trade Commission ("ITC") and now here in this Court.

**1.    The Instant Cases and the ITC Investigations**

On November 14, 2017, Plaintiff filed its respective Complaints in these cases, which are two of four patent infringement matters that it then filed against Defendants in this District. (*See, e.g.*, D.I. 1; D.I. 193 at 1)[2]  At that time, Plaintiff additionally filed two complaints at the ITC—

---

[2]    The parties have gone on to file various other litigation matters against each other in this Court, which are not directly relevant to this Motion.

ITC Investigation Nos. 337-TA-1090 (the "1090 Investigation") and 337-TA-1091 (the "1091 Investigation")—in which it asserted against Defendants some of the patents that are at issue in the matters filed in this Court. (D.I. 193 at 1)  In December of 2018, Plaintiff filed a third complaint at the ITC, Investigation No. 337-TA-1144 (the "1144 Investigation"). (*Id.* at 1, 4 n.5)

On May 28, 2018, as part of the discovery process in the 1090 Investigation and 1091 Investigation, Plaintiff took the deposition of Defendants' Vice President of Product Strategy, Dr. Rune Fisker. (D.I. 193 at 3)  According to Defendants, during the deposition, Plaintiff introduced an unredacted version of a 2014 presentation (the "2014 presentation"), which contained slides created by Mikkel Ninn-Grønne. (D.I. 193 at 3)  Mr. Ninn-Grønne is Defendants' Director of IP and is a registered European Patent Attorney ("EPA"). (*Id.*)

Defendants thereafter clawed-back the document, asserting that it was privileged; Defendants also later produced a privilege log that included a reference to this document. (*Id.*) Subsequently, in the 1090 Investigation, Plaintiff filed a motion to compel production of the document on various grounds. (*Id.*, exs. 4-5)

On August 3, 2018, Administrative Law Judge ("ALJ") Dee Lord granted Plaintiff's motion to compel, (*id.*, ex. 2), and on September 5, 2018, ALJ Lord denied Defendants' motion for reconsideration of her earlier decision, (*id.*, ex. 3); in so ruling, the ALJ concluded that, *inter alia*, the document was not protected by the patent-agent privilege.  In her decision on the motion for reconsideration, ALJ Lord ordered that Defendants were obligated to produce not only the 2014 presentation, but also any other information referenced in that presentation that related to the matters at issue in the ITC investigation. (*Id.*, ex. 3 at 14)  In compliance with this order, Defendants re-produced the 2014 presentation to Plaintiff, along with 94 additional documents. (D.I. 193 at 4 & ex. 1)

3

In the meantime, in the 1091 Investigation, Plaintiff had also moved to compel production of the 2014 presentation. On September 14, 2018, ALJ Clark Cheney granted this motion, limiting the required scope of Defendant's production to the 2014 presentation itself. (D.I. 198 at 4 & ex. S at 110-11; *id.*, ex. R at 5) ALJ Cheney explained that, in his view, this document was no longer confidential because it had been produced in the 1090 Investigation and, thus, it was no longer subject to privilege protection. (D.I. 198 at 4 & ex. S at 110-11; *id.*, ex. R at 5-6) Defendants did not seek review of this decision. (D.I. 198 at 4; *id.*, ex. R at 6)

In the 1144 Investigation, Defendants filed a motion for a protective order concerning the same materials; the motion was premised on the same privilege grounds that were at issue in the other two ITC Investigations and that are at issue here. (D.I. 198 at 5) On June 28, 2019, ALJ MaryJoan McNamara denied this motion, concluding that Defendants had not met their burden to show that the documents at issue were subject to the patent-agent privilege. (*Id.* & ex. R)

## 2.    The Instant Motion

On May 22, 2019, Defendants filed the instant Motion. (D.I. 145) Along with the filing of the Motion, the parties explained that: (1) Defendants had requested a protective order in these cases making clear that Defendants did not need to produce certain purportedly privileged documents in the cases (and that such documents should be returned to Defendants); and (2) Plaintiff opposed this request, arguing that (a) pursuant to ALJ Lord's decision in the 1090 Investigation, the documents at issue were properly produced to it in that case, and that it thus rightly has possession of such documents; (b) the documents are in fact not privileged and (c) even if the documents are privileged, such privilege has been waived. (D.I. 143; *see* D.I. 193 at 2)

4

The Court, as it typically does with all protective order disputes, initially called for abbreviated letter briefing on this issue, (D.I. 144); the parties thereafter submitted those letter briefs, (D.I. 151; D.I. 171). But in light of Defendants' argument that the "dispute involves complex legal and factual issues that cannot be fairly and fully addressed in a 3-page letter[,]" (D.I. 151 at 1), the Court ordered full briefing, (D.I. 182). That briefing was completed by July 15, 2019. (D.I. 182; D.I. 208) Thereafter, on July 22, 2019, the Court heard oral argument on the issue. (D.I. 223 (hereinafter, "Tr.").

### C.    The Disputed Documents, the Relevant Defendant Employees and the Duties of EPAs and Danish Patent Agents

With their Motion, Defendants are seeking a protective order that would prevent certain of the assertedly privileged documents ordered produced in the ITC Investigations from being deemed produced in this case (and thus, from being used in this case). There are approximately 61 such documents still at issue (the "disputed documents"),[3] which include e-mails, slideshow presentations, and various communications between members of Defendants' companies, including Defendants' Denmark-based in-house registered EPAs, and/or Defendants' Denmark-based patent agents who were purportedly working with those EPAs. (D.I. 193 at 4; D.I. 208 at Amended Privilege Log)

Defendants provided all of the documents at issue to the Court for *in camera* review. The Denmark-based EPAs and patent agents allegedly involved in the communications at issue here included at least Mr. Ninn-Grønne (an in-house EPA with Defendants), Sidse Thinggård (a patent agent for Defendants during the time of the communications at issue, who later became an

---

[3]    Defendants have withdrawn their claim of privilege as to 35 documents that were previously at issue in the ITC litigations because, upon further examination, Defendants realized that they could not demonstrate that such documents were authorized by an EPA or by someone assisting an EPA. (D.I. 208 at 2 n.3 & Amended Privilege Log; Tr. at 64)

EPA during her employment with Defendants), and Jesper Bo Jensen and Kristian Woller,

(patent agents for Defendants).  (D.I. 193 at 4-5; *see also id.*, exs. 8 & 9-9-C; D.I. 208 at 1-2 &

n.2)[4]  The communications in the disputed documents at issue appear to span from 2011 to 2017.

(D.I. 208 at Amended Privilege Log)  As to the substance of the communications, Defendants

have described them as falling primarily into three broad categories:  (1) legal analysis and

advice provided by the EPAs/patent agents relating to European patents; (2) documents directed

to or authorized by Defendants' EPAs that contain legal advice and analysis of global patent

portfolios of competitors and (3) competitor patent analysis in the context of the client's products

developed in Denmark and patent prosecution.  (D.I. 193 at 13; *see also* D.I. 208)  There are

numerous instances in the disputed documents where certain of Plaintiff's U.S.

patents/applications and patent claims are referenced and analyzed for infringement and/or

invalidity purposes.

        Defendants also submitted a declaration from Mr. Ninn-Grønne (the "Ninn-Grønne

Declaration") that, *inter alia*, describes the responsibilities of EPAs and foreign patent agents.

(D.I. 193, ex. 8)  Within his declaration, Mr. Ninn-Grønne explains that EPAs are legal

practitioners who have passed a European Qualifying Examination ("EQE"), which assesses

one's ability to answer legal questions and draft legal assessments.  (*Id.* at ¶¶ 5, 7)  Mr. Ninn-

Grønne states that although EPAs are not licensed attorneys and have not graduated from law

school, they perform functions similar to patent attorneys; he also states that EPAs are authorized

---

[4]        In their briefing, Defendants also make reference Arun Negi (an in-house EPA
with Defendants) and Mads Demenikov and Sangzi Sandra Chen (patent agents for Defendants)
as being relevant to this dispute.  (D.I. 193 at 4-5; *id.* ex. 9-D)  However, Mr. Negi, Mr.
Demenikov and Ms. Chen are not listed anywhere as authors or recipients of any of the disputed
documents, pursuant to Defendants' Amended Privilege Log.  (D.I. 208 at Amended Privilege
Log; *see also* D.I. 198 at 15-16)

to practice before the European Patent Office ("EPO"). (*Id.* at ¶ 5)  Mr. Ninn-Grønne and the

patent agents[5] who work with him:  (1) analyze patents (including Defendants' patents and their

competitors' patents) pertinent to the markets where Defendants compete; (2) are involved in

patent prosecution efforts, including drafting applications and communicating with outside

counsel regarding those applications; and (3) prepare freedom to operate, infringement and

validity opinions. (*Id.* at ¶ 6)  According to the Ninn-Grønne Declaration, companies in

Denmark typically obtain infringement opinions from EPAs and patent agents, rather than from

attorneys with a university degree in law. (*Id.* at ¶ 7)

## II.     LEGAL STANDARDS

The instant dispute is one where Defendants are seeking the entry of a protective order;

such orders are governed by Federal Rule of Civil Procedure 26.  The dispute also involves

analysis of the patent-agent privilege.  The Court addresses the standards regarding these legal

issues below; it will provide additional legal analysis relevant to certain of these issues in Section

III.

### A.     Rule 26

Rule 26 permits, with certain limits, "discovery regarding any nonprivileged matter that

is relevant to any party's claim or defense[.]" Fed. R. Civ. P. 26(b)(1).  A producing party may,

however, ask the Court to minimize its burden to turn over discoverable information by ordering

that a protective order issue; the Court may do so, if there is "good cause" to support the request,

in order to protect the moving party from "annoyance, embarrassment, oppression, or undue

burden or expense[.]" Fed. R. Civ. P. 26(c)(1).  A party seeking a protective order has the

---

[5]     Unlike EPAs, Danish patent agents have not passed the EQE and are not authorized to practice before the EPO. (*See* D.I. 193, ex. 8 at ¶ 5; *see also id.*, ex. 9-D)

burden of establishing good cause for its issuance. *Xerox Corp. v. Google, Inc.*, 270 F.R.D. 182, 183 (D. Del. 2010).

### B.    The Patent-agent Privilege

In *In re Queen's Univ. at Kingston*, 820 F.3d 1287 (Fed. Cir. 2016) ("*In re Queen's*"), the United States Court of Appeals for the Federal Circuit for the first time recognized a patent-agent privilege. In that case, plaintiffs Queen's University at Kingston and PARTEQ (together, "Queen's University") refused to produce certain documents relating to communications between Queen's University employees and its registered non-lawyer patent agents; the documents at issue discussed the prosecution of the patents-in-suit. *In re Queen's*, 820 F.3d at 1290. The district court ultimately ordered that the documents should be produced; in doing so, it noted that the documents were not protected by the attorney-client privilege and concluded that they were not protected by any, separate "patent-agent privilege," because no such privilege existed in the law. *Id.*

The Federal Circuit granted mandamus review, and ultimately overturned the district court's decision. In doing so, it noted that that Federal Rule of Evidence 501 authorizes federal courts to define new privileges if they are consistent with common law principles, and it explained that for various reasons, recognition of a new, patent-agent privilege was appropriate. *Id.* at 1292-94. The *In re Queen's* Court determined that recognition of such a privilege was warranted not only because (as the Supreme Court of the United States had explained in prior opinions) non-attorney patent agents in the United States regularly engage in the practice of law, but also because Congress specifically authorizes U.S. patent agents to engage in the practice of law before the United States Patent and Trademark Office ("USPTO"). *Id.* at 1295-96. The Federal Circuit also noted that "the lack of a patent-agent privilege would hinder

communications between patent agents and their clients, undermining the real choice Congress

and the [USPTO] have concluded clients should have between hiring patent attorneys and hiring

non-attorney patent agents." *Id.* at 1300 (noting that, in this way, the patent-agent privilege

"furthers the same important public interests as that of the attorney-client privilege"). Also

important to the Court's decision was that patent agents had a "professional status" conferred on

them by Congress' recognition of their work—a status enhanced by the fact that before they can

serve, they must pass an extensive examination, have a certain type of qualifying degree and

agree to obey ethical obligations imposed on them by the USPTO. *Id.* at 1300-01 (emphasis

omitted).

The Federal Circuit noted, however, that the scope of the patent-agent privilege must be

"carefully construed" and that the privilege applies only to "communications between non-

attorney patent agents and their clients[.]" *Id.* at 1301. It explained that the burden of

determining which communications fall within the scope of this privilege rests "squarely on the

party asserting the privilege." *Id.* Moreover, it noted that "[b]ecause patent agents are not

attorneys, they are not authorized by the bar of any state to practice law" and, as such, before

asserting the patent-agent privilege, "litigants must take care to distinguish communications that

are within the scope of activities authorized by Congress from those that are not." *Id.* The

Federal Circuit then explained that regulations promulgated by the USPTO "help to define the

scope of the communications covered under the patent-agent privilege" and that for

communications to be protected by this privilege, they must be "in furtherance of the

performance of [the tasks described in the USPTO's regulations or] are reasonably necessary and

incident to the preparation and prosecution of patent applications or other proceeding[s] before

the [USPTO] involving a patent application[.]" *Id.* (internal quotation marks omitted) For

instance, this privilege does not apply to communications that are "not reasonably necessary and incident to the prosecution of patents before the [USPTO,]" such as "communications with a patent agent who is offering an opinion on the validity of another party's patent in contemplation of litigation or for the sale or purchase of a patent, or on infringement[.]" *Id.* at 1301-02; *see also Onyx Therapeutics, Inc. v. Cipla Ltd.*, C.A. No. 16-988-LPS (CONSOLIDATED), 2019 WL 668846, at *2 (D. Del. Feb. 15, 2019). Ultimately, then, the Federal Circuit recognized "a patent-agent privilege extending to communications with non-attorney patent agents when those agents are acting within the agent's authorized practice of law before the [USPTO]." *In re Queen's*, 820 F.3d at 1302.

## III.    DISCUSSION

In order to resolve the Motion, the Court must answer a number of different questions. First, it must decide whether to apply the law of the Federal Circuit or of the regional circuit (here, the United States Court of Appeals for the Third Circuit). After making that determination (here, the Court, for reasons expressed below, will conclude that Federal Circuit law controls), the Court must decide how the Federal Circuit would examine this question pursuant to its own law. And lastly, the Court must apply those applicable legal principles to the record before it. It will attempt these steps below, in turn.

### A.    Does Federal Circuit Law or Third Circuit Law Apply?

The Court first must determine whether Federal Circuit law or Third Circuit law applies. Defendants suggested that Third Circuit law applies (though they argued that the ultimate outcome here would be the same regardless of which Circuit's law was utilized). (D.I. 193 at 10-11; Tr. at 9-12) Plaintiff, on the other hand, advocates throughout its briefing that Federal Circuit law controls. (D.I. 198 at 6)

10

The Court agrees with Plaintiff that the Federal Circuit's law applies here. In *In re Queen's*, the Federal Circuit explained that:

> Regarding discovery matters, *this Court has held that Federal Circuit law applies when deciding whether particular written or other materials are discoverable in a patent case, if those materials relate to an issue of substantive patent law. . . .* Applying these standards, we have held that we apply our own law when deciding whether particular documents are discoverable in a patent case because they relate to issues of validity and infringement. . . . We have also held that we apply our own law when making a determination of the applicability of the attorney-client privilege to [a party's] invention record [because it] clearly implicates, at the very least, the substantive patent issue of inequitable conduct. . . . *Similarly, this case involves the applicability of privilege for a patentee's communications with a non-attorney patent agent regarding prosecution of the patents-in-suit. Those types of communications are potentially relevant to numerous substantive issues of patent law, including claim construction, validity and inequitable conduct.*

*In re Queen's*, 820 F.3d at 1290-91 (alteration in original) (internal quotation marks and citations omitted) (emphasis added). As in *In re Queen's*, here the Court is called on to determine "whether particular written . . . materials are discoverable in a patent case," an issue that "involves the applicability of privilege for a patentee's communications with a non-attorney patent agent" about matters relevant to various questions of substantive patent law. And so, it seems that, just as the Federal Circuit did in *In re Queen's*, here too the Court should apply Federal Circuit law.

In its briefing, Defendants had at times suggested that *In re Queen's* "does [not] address whether Federal Circuit law governs in the present case[,]" and they argued that this is so (despite the above-quoted language from the *In re Queen's* decision), because unlike the circumstances there, this case implicates the "applicability of privilege to foreign [here, Danish] communications[.]" (D.I. 193 at 10) Defendants then argued that because the Federal Circuit

purportedly "defers to the law of the regional circuit on questions of comity[,]" the Federal Circuit would here conclude that Third Circuit law applies. (*Id.* at 10-11 (internal quotation marks and citation omitted)).[6] Yet typically, when a legal question implicates substantive issues relating to patent law, Federal Circuit (not regional circuit) law is applied to the question, and this is certainly such a case. Moreover, nothing in the Federal Circuit's decision in *In re Queen's* suggests that there, the Court applied its own law (as opposed to regional circuit law) because the scenario did not implicate activity in a foreign country, or questions of international comity. Indeed, as Plaintiff notes, (D.I. 198 at 7), one of the petitioners in *In re Queen's* was Queen's University at Kingston, which is located in Canada, and the documents in dispute in that case "included communications between Queen's University employees" located in Canada and "registered non-lawyer patent agent[s]" located in Canada and employed by one of Queen's University's Canadian affiliates. *In re Queen's*, 820 F.3d at 1290; (D.I. 198 at 7; *id.*, ex. L at A1-2, A18 & exs. M-N). And yet the Federal Circuit applied its own law (not regional circuit law) in that case.

For these reasons, the Court will apply Federal Circuit law.

**B.    In Resolving This Dispute, Were the Federal Circuit to Apply Its Own Law, How Would It Do So?**

Now that the Court has determined that it is appropriate to apply Federal Circuit law here, the next question is: In applying its own law to this issue, what exactly would the Federal Circuit do here?

---

[6]    During oral argument, Defendants' counsel seemed to back away from this position a bit, at one point stating that he "wouldn't say that" Federal Circuit law did not apply in this case. (Tr. at 10)  So perhaps there really is not a dispute that the Court should look to Federal Circuit law. But because Defendants' position on this issue has not been clear, the Court explains here why it believes that Federal Circuit law does apply.

On this score, in their briefing, Defendants argued that even if the Federal Circuit was going to apply its own law, that law suggests that the Federal Circuit would "observe[] principles of international comity[.]" (D.I. 193 at 11) In doing so, Defendants suggested that the Federal Circuit would employ one of two tests that have been used by other federal courts— the "'touch[] base' test [or] the 'functional' test"—in order to determine whether to utilize a foreign country's privilege law in resolving this dispute. (*Id.* at 12)[7] And Defendants then reasoned that when one applies either the "touch base" test or the "functional" test to the facts at hand here, the outcome is that "Danish law should apply to th[is] question of privilege" (*Id.* at 11-14; *see also* Tr. at 10) But then, at oral argument, Defendants' counsel seemed to state that he was *not* arguing that the "touch base" test or the "functional" test applied here; instead, counsel suggested that the Court should simply look to "international principles of comity [that] would make you look straight to Danish law." (Tr. at 13, 19-20)

---

[7]      Under the "touch base" test, "any communications touching base with the United States will be governed by the federal discovery rules while any communications related to matters solely involving [a foreign country] will be governed by the applicable foreign statute." *Astra Aktiebolag v. Andrx Pharms., Inc.*, 208 F.R.D. 92, 98 (S.D.N.Y. 2002) (alterations in original) (internal quotation marks and citations omitted); *see also Tulip Computs. Int'l B.V. v. Dell Comput. Corp.*, 210 F.R.D. 100, 104 (D. Del. 2002). Under such an analysis, when allegedly privileged communications take place in a foreign county or involve foreign attorneys or proceedings, the court defers to the country that has the "predominant interest" in whether the communications should remain confidential, unless that foreign law is contrary to the public policy of the forum. *Astra*, 208 F.R.D. at 98 (internal quotation marks and citation omitted). Under the "functional" test, the court "look[s] to the foreign nation's law to determine the extent to which the privilege may attach" to communications with a foreign patent agent. *Smithkline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 535 (N.D. Ill. 2000). In applying this test, courts first examine "whether the foreign nation in question extends the privilege to its patent agents"; if such a privilege exists, the courts then move on to assess the "specific capacity in which the agent was functioning with respect to a given document." *Id.* (recognizing application of the privilege when the agents are "more or less functioning as attorneys")

13

For its part, in its briefing, Plaintiff argued that the Federal Circuit would simply apply "its own substantive privilege law" in the manner set out in *In re Queen's* in order to address this dispute. (D.I. 198 at 7) But then at oral argument, Plaintiff's position became less clear. At times, Plaintiff's counsel suggested that because the communications at issue all relate to "an analysis of U.S. patents" then United States law would apply (such that one would "never get to . . . Danish law"), and because the disputed documents involve patent agents doing "something beyond the authority to practice law" then no privilege would attach. (Tr. at 44-45) But at other times, it suggested that the Federal Circuit "may look at Danish law" and the extent to which Danish law "connects privilege to legal proceedings[.]" (*Id.* at 45-46)

By the end of oral argument, the Court was not sure exactly what either party was really arguing here (beyond the fact that one side hopes that the disputed documents are found to be privileged, and one side hopes they are not). And the parties' uncertainty is understandable. After all, it has only been a few years since the Federal Circuit, for the first time, recognized the existence of a patent-agent privilege. Moreover, the underlying legal issues here are challenging. Amid all of this uncertainty, the Court comes to the following four conclusions.

First, the Court sees no evidence that in resolving this issue, the Federal Circuit would necessarily utilize either the "touch base"[8] test or the "functional" test. This is in significant part because, so far as the Court can tell, the Federal Circuit has never actually applied either such test in its history. (Tr. at 14)[9]

---

[8]    It is also worth noting that, at least in the case of the "touch base" test, use of the test has been "subject to criticism[.]" (D.I. 193 at 12 n.8; D.I. 198 at 9 n.9)

[9]    As noted above, in *In re Queen's*, the Federal Circuit was dealing with challenged communications made by patent agents who were located in a foreign country—and yet there, the Court did not turn to either the "touch base" test or the "functional" test to help it determine the correct answer to the legal questions before it. That said, it is not clear to the Court that any party in *In re Queen's* even suggested to the Federal Circuit that the law of any other country

Second, the Federal Circuit's decision in *In re Queen's*, while helpful to the Court's ultimate analysis here, only gets us so far. In that case, the patent agent at issue, although based in Canada, was registered to practice before the USPTO. (D.I. 203 at 4 & ex. 16; Tr. at 24) And relatedly, the *In re Queen's* Court ultimately recognized that the patent-agent privilege it announced extended to "communications with non-attorney patent agents when those agents are acting within the agent's authorized practice of law before the" USPTO—that is, to communications that are "in furtherance of the performance of [tasks described in the USPTO's regulations]" or are "reasonably necessary and incident to the preparation and prosecution of patent applications or other proceeding[s] before the" USPTO. 820 F.3d at 1301-02 (internal quotation marks and citation omitted). Yet here, none of the EPAs/patent agents at issue are authorized to practice before the USPTO. And so it would seem to make little sense to examine whether, as to the disputed documents, these EPAs/patent agents were acting within the bounds of their "authorized practice of law before" that body, or were engaging in tasks "reasonably necessary and incident to" the prosecution of patents before that body.[10] *See Knauf Insulation, LLC v. Johns Manville Corp.*, No. 1:15-cv-00111-TWP-MJD, 2019 WL 4832205, at *1, *4 (S.D. Ind. Oct. 1, 2019) (noting that in *In re Queen's* the Federal Circuit "did not address the application of the [patent-agent] privilege to communications with foreign patent agents" and that, as a result, the district court's role was to "apply the law of privilege, as informed by the

---

(i.e., Canada) *should* apply in that case. *Cf. Baxter Int'l, Inc. v. Becton, Dickinson & Co.*, Case No. 17 C 7576, 2019 WL 6258490, at *2 n.4 (N.D. Ill. Nov. 22, 2019).

[10]     There is no dispute that the disputed documents would not be covered by the particular scope of the patent-agent privilege discussed in *In re Queen's*, since none of the disputed documents relate to a patent agent's work amounting to the authorized practice of law before the USPTO (i.e., communications reasonably necessary and incident to authorized patent prosecution before the USPTO). (D.I. 198 at 13-14)

relevant law—in this case, the Federal Circuit's holding in [*In re Queen's*]" to the case before it, which involved a party's communications with a foreign patent agent in the United Kingdom who was not authorized to practice before the USPTO).

Third, the Court does not believe that the Federal Circuit's analysis would end there. In other words, it does not seem right that the Federal Circuit would conclude that because the foreign EPAs/patent agents at issue here are not authorized to practice law before the USPTO (such that their work did not implicate practice "authorized" by that body or by the U.S. Congress), then no aspect of their communications with a client could ever be recognized as being subject to a patent-agent privilege in United States courts. *See Knauf Insulation*, 2019 WL 4832205, at *5 (concluding that the court "disagree[d]" with the argument that "the patent-agent privilege may be applied only to patent agents who are registered with the [USPTO]"). After all, as Defendants note, (D.I. 193 at 11), in other contexts, the Federal Circuit has recognized that principles of international comity sometimes require it to examine the contours of a foreign jurisdiction's laws. *See Cochran Consulting, Inc. v. Uwatec USA, Inc.*, 102 F.3d 1224, 1226-27 (Fed. Cir. 1996). Moreover, this conclusion seems in line with the way that the Federal Circuit assesses claims of attorney-client privilege when communications between a foreign attorney and her client are at issue. In such cases, if there was a conflict between U.S. privilege law and the foreign country's privilege law, the Court would apply foreign privilege law to determine whether the communications at issue were protected by the attorney-client privilege. *In re IPCom GmbH & Co., KG*, 428 F. App'x 984, 985-86 (Fed. Cir. 2011).[11]

---

[11]    In the 1090 Investigation, although ALJ Lord recognized that the rationale of the decision in *In re Queen's* should control resolution of this privilege issue, the ALJ appeared to determine that because the disputed documents relate to communications that would not be within the scope of a patent agent's authority *as recognized by the USPTO* (i.e., because they relate to "analysis of competitor patents and legal advice to 3Shape's management" on such

16

Fourth and lastly, after applying the reasoning above and the guidance provided by *In re Queen's*, the Court concludes that were the Federal Circuit confronted with this issue, it would determine that a patent-agent privilege could serve to shield certain communications between registered foreign patent agents and their clients from disclosure, if the party seeking protection could either show that: (1) the communications at issue were made to or by patent agents acting within the scope of the "authorized practice of law" set out by the law of the foreign country (or by the regulations of an governmental entity similar to the USPTO); or (2) the law of the foreign country at issue otherwise recognizes a patent-agent privilege that is broader than or otherwise in conflict with that recognized by United States courts, and the foreign communications at issue fall within the scope of that privilege. *In re Queen's*, 820 F.3d at 1302; (Tr. at 50, 52); *cf. Knauf Insulation*, 2019 WL 4832205, at *5-6 (concluding that *In re Queen's* counseled that "as long as the patent agent in question is subject to regulation in his or her own country analogous to being registered with the [USPTO] in this country, [then] applying U.S. privilege law to foreign patent agents means applying the patent-agent privilege to communications relating to services that the patent agent is *permitted to provide in the patent agent's own country*" and that if the foreign

---

patents), then they would not be protected by the patent-agent privilege. (D.I. 193, ex. 2 at 6; *see also* D.I. 198, ex. E at 8 (ALJ Lord concluding, in resolving a motion for reconsideration, that *In re Queen's* provides that any privilege extending to foreign patent agents would be "limited in scope to patent prosecution and related activities" and that none of the disputed documents at issue involved such communications)) As the Court has noted above, it does not read *In re Queen's* as counseling that a foreign patent agent's communications with a client should be protected only to the extent that those communications are within the scope of the *USPTO's regulations for U.S. patent agents*. Although the Federal Circuit's decision in *In re Queen's* came in the context of a case where the patent agent at issue was registered with the USPTO, the Court sees no indication therein that the Federal Circuit would analyze a foreign patent agent's conduct by asking whether it matches with the scope of the *USPTO's regulations*—since the USPTO is a body that would have no connection to or authority over the work of such a foreign patent agent.

patent agent made "communications [with the client] within the scope of [the patent agent's] *authority as a patent attorney in the U.K.*" such communications could be protected) (emphasis added).[12]

### C.      Applying the Court's Decision

In line with its decision above, the Court looks to the entire record to see whether Defendants have sufficiently established the entitlement to patent-agent privilege protection for the disputed documents. *See* Fed. R. Civ. P. 44.1 (noting that in determining foreign law, the court may "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence").[13]

---

[12]      This conclusion seems to be at least partly in line with the thinking behind the USPTO's "Rule on Attorney-Client Privilege for Trials Before the Patent Trial and Appeal Board[,]" adopted on November 7, 2017.  37 C.F.R. § 42.57; *see also Knauf Insulation,* 2019 WL 4832205, at *6.  That rule states that a communication between a client and a "foreign jurisdiction patent practitioner that is *reasonably necessary and incident to the scope of the practitioner's authority* shall receive the same protections of privilege under Federal law as if that communication were between a client and an attorney authorized to practice in the United States, including all limitations and exceptions." 37 C.F.R. § 42.57(a) (emphasis added).  The rule defines a "[f]oreign jurisdiction patent practitioner" as a "person who is authorized to provide legal advice on patent matters in a foreign jurisdiction, provided that the jurisdiction establishes professional qualifications and the practitioner satisfies them." *Id.* § 42.57(b).  In commentary to the rule, the USPTO noted that the *In re Queen's* decision "only addresses domestic patent agents" and that "[w]ithout comparable protections in U.S. tribunals for foreign practitioners, privileged communications with U.S. patent attorneys may effectively lose that protection through parallel communications with foreign practitioners prosecuting corresponding foreign applications, which often raise very similar legal issues." Rules on Attorney-Client Privilege for Trials Before the Patent Trial and Appeal Board, 82 Fed. Reg. 51570, 51572 (Nov. 7, 2017).

[13]      Plaintiff filed various objections to certain documents (or portions of such documents) that were submitted by Defendants, arguing that the material was submitted too late, or was irrelevant, or "inadmissible." (D.I. 172; D.I. 199; D.I. 211)  In this Memorandum Order, the Court has considered the contents of such documents and has given them whatever weight it feels is deserved, for the reasons set out herein.  To the extent the Court has not referenced a document submitted by Defendants, that is because the Court did not believe that the document was particularly relevant to or helpful to the analysis it has undertaken.

In support of their assertion of privilege, Defendants point prominently to the declaration of Mikkel Vittrup (the "Vittrup Declaration"), their Danish attorney; Mr. Vittrup therein discusses the application of revised Danish Procedural Code Section 170 ("Section 170"). (D.I. 193 at 14 (citing *id.*, ex. 11 at ¶ 5); Tr. at 28) According to the Vittrup Declaration "Denmark passed [this] law [i.e., revised Section 170]" in June 2018. (D.I. 193, ex. 11 at ¶ 5) And to support the proposition that certain "legal advice of EPAs and their assistants is privileged and immune from discovery" in Denmark, (D.I. 193 at 14), Defendants point to a part of the Vittrup Declaration where Mr. Vittrup cites to Section 170(1) of the law, which states that "[w]here the giving of evidence would be against the wishes of a person having a right to confidentiality, persons bound by professional secrecy, such as . . . patent advisors whose names appear on the list referred to in Article 134 of the European Patent Convention ["Article 134"] . . . must not be demanded to give evidence about matters having come to their knowledge in the course of the exercise of their functions." (*Id.*; *see also* D.I. 193 at 14-15 (pointing to this portion of the law as being particularly relevant here)) Mr. Vittrup also opines that it "follows" from this portion of Section 170 that "the privilege also applies to the assistants of [EPAs]" if it is shown that they are "under a certain degree of instruction and supervision from the person actually enjoying the privilege." (D.I. 193, ex. 11 at ¶ 8) And Mr. Vittrup also states that, in his opinion, this law has "retroactive application[.]" (*Id.* at ¶ 7) Overall, Defendants argue that this portion of the Danish Procedural Code reflects the "broader legal role accorded to EPAs in Denmark[.]" (D.I. 193 at 15)

In analyzing this issue, the Court will assume *arguendo* that: (1) Defendants have provided sufficient evidence to indicate that Section 170 could be applied retroactively to cover the disputed documents (which all predate June 2018); and (2) Defendants have done enough to

19

show that the communications of non-EPA "assistants" could possibly be covered by Section 170's dictates. But even doing so, for at least two reasons, the record does not show that Defendants have met their burden to demonstrate that the disputed documents are protected by a patent-agent privilege.

First, this is because Defendants have not sufficiently demonstrated that the disputed documents all implicate communications in some way involving "patent advisers whose names appear on the list referred to in Article 134[.]" In that regard, Defendants have provided record evidence that the names of Mr. Ninn-Grønne, Mr. Negi and Ms. Thinggård were found on the list referred to in Article 134 as of June 2019. (D.I. 193, ex. 9-A to 9-D) Yet, as was previously noted above, Defendants acknowledge that Ms. Thinggård was not an EPA in the time frames when the disputed documents were created, and Mr. Negi is not referenced at all on Defendants' Amended Privilege Log. As for Mr. Ninn-Grønne, the Court does not have evidence indicating that he was on the list referred to in Article 134 as of the dates when the disputed documents were created. (*Cf.* D.I. 198, ex. R at 10)

Second, this is because the Vittrup Declaration does not make clear exactly what "functions" EPAs are permitted to engage in pursuant to Danish law that could be said to amount to the authorized practice of law. That is, it does not sufficiently demonstrate exactly how it is, pursuant to Danish law, that EPAs in Demark have been legally authorized to perform a "broader legal role" than USPTO-registered patent agents. (D.I. 198 at 10 (Plaintiff arguing that such a proposition is "supported neither Danish by law . . . nor the facts"); Tr. at 77, 79-80) Nor does the Vittrup Declaration itself provide clear indication that otherwise, Danish law provides for a

patent-agent privilege that is broader in scope or in conflict with the privilege set out in *In re Queen's* and that covers the disputed documents.[14]

Defendants additionally point to the Ninn-Grønne Declaration, (Tr. at 30, 32), but it does not do the work required of it. At most, in that declaration, Mr. Ninn-Grønne discusses the scope of his own work as an EPA, his view that his duties are "typical of" the duties of other EPAs and his sense of what "[c]ompanies in Denmark" typically require from EPAs. (D.I. 193, ex. 8 at ¶¶ 6-8) But the document does not state that Mr. Ninn-Grønne's name appeared on the list referred to in Article 134 in the years in question. And it does not demonstrate the extent to which the law of Denmark[15] authorizes EPAs to take certain actions that amount to the practice of law, or whether Danish law otherwise recognizes a patent-agent privilege broader than or in conflict with that set out in U.S. law. (*See* D.I. 198 at 11 (Plaintiff arguing that Mr. Ninn-Grønne's declaration "dodges the key inquiry of *Queen[']s* and other cases to analyze the issue[,] which is what activities are patent agents 'authorized' by the government to perform"); Tr. at 52

---

[14]    In a supplemental declaration that Mr. Vittrup prepared, which Defendants provided along with their reply brief, Mr. Vittrup further opined on this point that "the purpose of [this revision to Section 170] was to give [EPAs] the same legal privilege as applied to Danish attorneys at law." (D.I. 203, ex. 14 at ¶ 9) However, the wording of Section 170(1) states only that EPAs who are on the list referred to in Article 134 may have protection for "matters having come to their knowledge in the course of the exercise of their functions." (D.I. 193, ex. 11 at ¶ 5) Whether this is a reference to an EPA's "functions" in representing clients before the EPO, or to other, broader "functions" (and what, exactly, such "functions" amount to) is entirely unclear from the record.

[15]    Mr. Ninn-Grønne states in his declaration that he is permitted by the EPO to practice before that body, (D.I. 193, ex. 8 at ¶ 5), though he is not authorized to practice law in any court in Denmark, (D.I. 198, ex. O at 16, 54; Tr. at 60). The EPO has requirements that those who practice before it must meet, (D.I. 193, ex. 9-A); if EPAs meet those qualifications, then it could be said that they have EPO "authorization" to practice before that body. (Tr. at 30) But none of the disputed documents involve or relate to practice before the EPO. And so the Court does not see how any form of legal "authorization" from the EPO as to Mr. Ninn-Grønne's work could be relevant to a finding that the disputed documents are subject to the patent-agent privilege.

21

(Plaintiff's counsel noting that the key question is not what an EPA like Mr. Ninn-Grønne's "duties and responsibilities [are or] what do you do on a day-to-day basis, and things of that nature[,]" but instead "looking at the authorized practice of law"); D.I. 198, ex. O at 33-34, 42-43 (Mr. Ninn-Grønne confirming in his deposition that his opinions were based only on his "experience" and not "on law"))

Defendants bore the burden to demonstrate that a foreign patent-agent privilege applied to the disputed documents. Yet in light of the above, they have failed to meet that burden here. And so their Motion must be denied.[16]

## IV.    CONCLUSION

For the reasons set out above, the Court orders that Defendants' Motion for Protective Order be DENIED.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. Any such redacted version shall be submitted no later than **February 10, 2020**, for review by the Court, along with a motion for redaction that includes a clear, factually detailed explanation as to why disclosure of any proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

---

[16]    In their briefing and at oral argument, the parties also disputed whether, to the extent that the disputed documents might have been protected by the patent-agent privilege, such protection had been waived by Defendants. (*See* D.I. 193 at 18-20; D.I. 198 at 17-20; D.I. 203 at 8-10) However, since the Court has found that Defendants have not met their burden to demonstrate that the disputed documents are privileged, it need not discuss waiver here.

Dated:  February 3, 2020

Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE